**EXHIBIT A**

**AFFIDAVIT OF EUGENE M. DIFIORE**

I, Eugene M. DiFiore, being duly sworn, depose and state as follows:

1.  I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been so employed for approximately seven and one-half years. I am currently assigned to the Logan Airport Task Force ("LATF") based at Logan International Airport in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police ("MSP") and special agents from Homeland Security Investigations and the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics using the resources of the participating law enforcement agencies.

2.  Prior to my employment with the DEA, I was employed as a police officer with the Methuen Police Department in Methuen, Massachusetts from 1995 to 1999. I was also a police officer with the Amesbury Police Department in Amesbury, Massachusetts beginning in 1999 until I accepted a position as a criminal investigator with the DEA in 2005.

3.  Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities. I have conducted or assisted in number of narcotics investigations. I have testified in both the federal and state courts; I have applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

4.  I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following asset:

>$79,980 in United States currency seized from Philip Lu at Logan International Airport, East Boston, Massachusetts on November 1, 2012 (the "Currency").

5. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

6. This affidavit is based upon my personal knowledge, as well as information provided to me by law enforcement personnel from the LATF involved in the investigation, and my review of records and reports relating to the investigation.

7. As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

**I.    The Investigation**

    **A.    The Seizure of the Currency**

8. On November 1, 2012, Phillip Lu ("Lu") was scheduled to fly on a one-way airfare from Boston, Massachusetts to Sacramento, California, via a connecting flight in Salt Lake City, Utah. Law enforcement learned that Lu booked this flight within 48 hours of his intended departure date. Law enforcement also learned that the phone number Lu used to secure his flight reservation (215-300-9932, hereinafter "Lu Phone Number 1") was a phone that was previously used to contact Zhao Xiang Gong ("Gong").

9. Gong was a target in a previous investigation jointly administered by the DEA and the Department of Homeland Security ("DHS") involving the distribution of ecstasy tablets. This investigation led to the arrest and indictment of Gong on federal drug charges. *See* United States v. Zhao Xiang Gong, Case Number 10-20424-CR-UNGARO, United States District Court for the Southern District of Florida. The case was transferred to the Eastern District of Pennsylvania and on or about May 8, 2012 Gong pled guilty to conspiracy to distribute MDMA (ecstasy).

10. During the Gong investigation, law enforcement also learned that Lu used a second phone number, which was also in contact with Gong (267-577-5553, hereinafter "Lu Phone Number 2").

11. DEA Special Agent David O'Neill ("Special Agent O'Neill") and I, along with other members of the LATF began surveillance of Gate A-16 in Terminal A of Logan International Airport. LATF personnel found Lu sitting in the area of Gate A-16 waiting to board his Delta Airline flight to Salt Lake City, Utah.

12. Special Agent O'Neill and I went to the Delta Airline luggage room to determine whether Lu had checked any baggage for his flight. We located the baggage intended for the Salt Lake City flight and identified a roll-a-way bag bearing tag number 80069677163 in the name of Philip Lu.

13. After locating Lu's checked bag, I returned to the waiting area at Gate A-16 where Lu was seated. Special Agent O'Neill remained in the Delta Airline luggage room and waited for assistance from MSP Trooper John J. Morris ("Trooper Morris") and his K-9 partner Rocky.

14. When Trooper Morris arrived in the luggage room, Special Agent O'Neill informed him of Lu's checked bag and requested that he and Rocky perform an exterior scan of the bag.

15.     Rocky is a seven year-old Labrador Retriever, and was accredited for narcotic odor detection by the New England State Police Administrators Conference. In July of 2012, Trooper Morris and Rocky successfully completed and received their annual recertification. Previous positive alerts by Rocky have resulted in the discovery and seizure of illegal narcotics and bulk currency.

16.     Special Agent O'Neill arranged Lu's bag among four other randomly selected bags from the Delta Airlines luggage room. Trooper Morris and Rocky then conducted an exterior scan of the five bags. Rocky had a positive alert to the presence of narcotic odor from Lu's checked bag. Special Agent O'Neill then secured Lu's luggage and proceeded to Gate A-16.

17.     At Gate A-16, Lu was speaking with an unidentified Asian female in the waiting area. Special Agent O'Neill and I engaged Lu in a conversation, while MSP Trooper Robert Bannister ("Trooper Bannister") and DHS/Immigration and Customs Enforcement Special Agent Richard F. Atwood ("Special Agent Atwood") spoke to the unidentified Asian female.

18.     Special Agent O'Neill and I approached Lu and displayed our credentials. We asked Lu if he would speak with us about his travel. Lu agreed and asked if we could move the conversation away from where he initially sat. We agreed and the three of us moved a short distance away from his original location in the waiting area. Special Agent O'Neill informed Lu he was under no obligation to speak with us and could end the conversation at any time. Lu indicated he understood but informed us that his English speaking skills were not great.

19.     Special Agent O'Neill displayed the checked luggage bearing tag number 80069677163 and asked Lu if the bag belonged to him. Lu indicated the bag did belong to him and asked if anything was wrong. Special Agent O'Neill informed Lu that a MSP K-9 trained to

detect narcotics odors alerted to his checked bag.  Lu reacted with a surprised expression and claimed he did not know why the K-9 would alert to the bag.

20.     Shortly into our conversation, Lu became extremely nervous.  He paced around, fidgeted with his hands, and continued looked over to where Trooper Bannister and Special Agent Atwood were speaking with the unidentified Asian female.  Trooper Bannister and Special Agent Atwood later confirmed Lu and the unidentified Asian female were booked for the same flight and did not know one another.

21.     When Lu was asked how much money was inside the bag he said $30,000.  Lu said that he was meeting a friend in Sacramento and that he intended to use the money to gamble during their trip to Las Vegas, Nevada.  Lu did not recall the name of his friend.

22.     Lu said that he arrived in Boston four or five days earlier, and had the $30,000 with him when he arrived.  When Special Agent O'Neill told Lu he found it unusual that someone would travel to the East Coast with so much money if it was meant to be used for gambling a week later in Las Vegas, Lu then said that he worked in real estate and brought the money with the intention of possibly purchasing real property.  Special Agent O'Neill asked why Lu originally stated he planned to use the money to gamble, Lu responded that the money was meant for both purposes.

23.     Special Agent O'Neill asked Lu about the potential real estate investments, asking about the properties Lu was considering, what towns or cities they were located in and whether Lu used a local real estate broker for assistance.  Lu had a blank expression, appeared baffled and said "I no understand."  Lu said that he did not speak English very well and did not understand.

24. In order to ensure Lu's understanding of the conversation, Special Agent O'Neill requested the assistance of MSP Trooper David Jung ("Trooper Jung") who is fluent in both Cantonese and English and previously provided interpretive support in similar conversations.

25. When Trooper Jung arrived at Gate A-16, Special Agent O'Neill and I apprised him of our conversation with Lu. Trooper Jung introduced himself to Lu and explained why his assistance had been requested. The remainder of the conversation with Lu was facilitated with the aid of Trooper Jung.

26. Trooper Jung confirmed that Lu understood that a narcotics K-9 positively alerted to checked luggage that Lu said belonged to him and that Lu further said contained $30,000.

27. Trooper Jung asked Lu if he would sign a Consent to Search form known as DEA Form 88 for the checked luggage and his black carry-on shoulder bag. After being informed that the bag would otherwise be detained while applying for a warrant permitting the search of his two bags, Lu consented to the search and signed the DEA Form 88. Special Agent O'Neill moved the luggage and carry-on bag to a more secluded location within Lu's sight.

28. With the assistance of Trooper Jung, I continued my conversation with Lu. Lu said that he spent five days looking at real estate in the Quincy area after hiring a taxi cab service to drive him to various property locations. Lu did not provide the name of the taxi cab service or produce any receipts or other documentation for the trips.

29. Special Agent O'Neill along with other members of the LATF examined Lu's two bags and found well over $50,000 in United States currency. This currency was later counted and totaled $79,980 (*i.e.*, the Currency). Lu's checked luggage contained eight bubble envelope mailers enclosing United States currency. The black carry-on shoulder bag contained several empty letter-sized envelopes wrapped around one letter-sized envelope enclosing a much small

amount of United States currency. When asked how much money he actually possessed, Lu said maybe $80,000.

30.     Lu said that he packed his checked luggage and carry-on bag himself and denied any involvement in drug trafficking and said that the Currency was neither derived from the sale of narcotics nor was intended for the purchase of narcotics. Lu could not provide a reason why Rocky positively alerted to the presence of narcotics odor during the exterior examination of his checked bag. Lu stated his reason for not originally revealing the total amount of currency in his possession was because he just did not want to give the "full story." Trooper Jung asked Lu, "Well, what is the full story?" In response Lu laughed and tapped Trooper Jung on the shoulder in a friendly manner.

31.     Toward the conclusion of our conversation with Lu, Lu said that he was self-employed and recently purchased a bar/lounge called the Westport Inn located in Philadelphia, Pennsylvania. Lu could not provide details such as how much start-up revenue was required for the purchase, whether he had any business partners or employees, and if he had procured any of the appropriate licenses associated with running a bar or lounge. A search performed subsequent to our conversation with Lu determined that Lu did not own a bar/lounge named Westport Inn located in Philadelphia, Pennsylvania.

32.     During the conversation with Lu, with the assistance of Trooper Jung, Special Agent O'Neill asked Lu how Lu could be reached by telephone. Lu indicated that he could be reached by the cell phone he had in his hand. Lu then provided Special Agent O'Neill, in English, the following cell phone number: 215-300-9932. This phone number is Lu Phone Number 1. Special Agent O'Neill immediately dialed Lu Phone Number 1 to confirm that it was a good contact for Lu. After the second attempt, Lu's phone rang and displayed Special Agent O'Neill's

cell phone number.  In addition to this phone, law enforcement found another cell phone in Lu's baggage as well as a SIM card.  A SIM card is a small "smartcard" that is inserted into mobile devices like cell phones, and can be transferred between different mobile devices.  SIM stands for Subscriber Identity Module.

33. Lu also said that he filed taxes for the previous year and reported earnings of approximately $20,000 to $30,000.  Lu then expressed concern with making his flight to Salt Lake City and our conversation with him concluded at this time.

34. Trooper Jung and I informed Lu that the Currency would be seized as illegal proceeds of narcotics trafficking and subject to forfeiture.  We suggested he obtain a receipt for the Currency at the MSP Troop F Barracks located inside the airport, but Lu declined.  Trooper Jung advised Lu that a receipt could be produced to him upon a formal request.  The Currency was transported back to the Troop F Barracks.

35. Based on my training and experience, I know that drug transactions are cash transactions and that those involved with the illegal narcotics business may carry significant amounts of cash.  I further know that those who traffic in narcotics often transport significant amounts of cash by air travel, as well as other methods of travel.  Narcotics traffickers may make regular trips to and from source cities to transport payment for and proceeds of narcotics.  These trips often involve use of one-way airfares, which may be purchased on short notice.  In addition, based on my training and experience, I know that drug traffickers often utilize multiple cellular telephones in an effort to avoid detection by law enforcement.

B. **Phone Records and Statements Regarding Lu**

36.  Law enforcement obtained telephone records for Lu Phone Numbers 1 and 2. Lu Phone Numbers 1 and 2, in addition to the contacts with Gong as described above, were also used to contact others involved in narcotics trafficking.

37.  On December 27, 2012, which was approximately two months after the Currency was seized from Lu, the Sacramento, California office of the DEA alerted Boston DEA to a suspicious crate departing from a Yellow Freight facility in Sacramento scheduled to be delivered to a Yellow Freight facility in North Reading, Massachusetts. The sender, Xiong Lian Chao ("Chao"), described the contents of the crate as a "massage machine." The telephone number on the bill of lading was 626-417-5782. Law enforcement learned that this telephone number was associated with Chao.

38.  A source of information in Sacramento reported marijuana odor emanating from the crate. Once the crate arrived in Massachusetts, law enforcement applied for and received a Massachusetts state search warrant for the crate. Inside the crate law enforcement found approximately 60 pounds of marijuana, which was seized.

39.  After the marijuana was seized, the crate was returned to the Yellow Crate facility in North Reading for delivery. On January 4, 2013, Chao went to the Yellow Crate facility and retrieved the crate, which he placed in a U-Haul van. DEA special agents conducted surveillance on the van, which Chao drove to 39 Lambert Street in Chelsea, Massachusetts. Law enforcement subsequently arrested Chao, as well as Lian You Yu ("Yu") and Wai Tang ("Tang"), who were inside the home at 39 Lambert Street.

40.  Yu provided post-arrest statements to Special Agent O'Neill. During their conversation, Special Agent O'Neill showed a picture of Lu to Yu. Yu stated he recognized Lu

and indicated they met on October 31, 2012, the day before the seizure of the Currency, in Quincy, Massachusetts to discuss the purchase of bulk quantities of marijuana. Yu stated he did not conduct business with Lu because Lu's prices were too expensive. While discussing his connection to Lu, Special Agent O'Neill noted Yu became uneasy and attempted to minimize his relationship to Lu.

41. Lu Phone Number 1 and Lu Phone Number 2 were both used to contact the phone number listed on the bill of lading for the crate (*i.e.*, Chao) in October and November of 2012. In addition, Lu Phone Number 2 was used to contact a phone number used by Yu (who said he discussed a potential marijuana purchase with Lu in Boston) in December of 2012. In addition, records for Lu Phone Number 1 also show contacts with a phone number used by Kong Ngo ("Ngo") in October and November of 2012. On October 3, 2012 Special Agents in Sacramento seized $45,475 in United States currency from Ngo at the Sacramento airport after a K-9 positively alerted to the currency Ngo was carrying in a backpack-style carry-on bag.

## Conclusion

42. Based upon the information set forth above, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. §881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

Signed under the pains and penalties of perjury this 15th day of March 2013.

_____
Eugene M. DiFiore, Special Agent
United States Drug Enforcement Administration